```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MISSOURI
                         EASTERN DIVISION

ALEX TOTH,                      )
                                )
           Plaintiff,           )
                                )
      v.                        )     No. 4:02 CV 939 DDN
                                )
JO ANNE B. BARNHART,            )
Commissioner of                 )
Social Security,                )
                                )
           Defendant.           )
```

**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Alex Toth for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. (Doc. 1.) The parties have consented to the authority of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.)

**I. BACKGROUND**

**A. Plaintiff's applications and judicial allegations**

Plaintiff applied for supplemental security income on September 10, 1998 and on November 1, 1999. In both applications he alleged he was disabled on October 20, 1997. (Tr. 132, 134.) His claim was denied on January 6, 2000. (Tr. 115.) In an application for benefits dated July 25, 2000, plaintiff alleged he became disabled on June 9, 2000, at age 41, on account of his left hip replacement on November 4, 1999, and arthritis in his left hip which limit his ability to work. (Tr. 129, 173.) Ultimately, the decision of an ALJ on December 18, 2004, became the final decision of the Commissioner of Social Security denying the claim to disability benefits.

In this judicial action plaintiff argues that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole and is not consistent with the Commissioner's regulations and applicable case law. The court agrees and remands.

**B. Administrative and judicial proceedings**

On January 3, 2002, plaintiff's administrative case was heard by Administrative Law Judge J. Brad Griffith. After the hearing, on January 3, 2002, the ALJ requested a consultative psychological examination of plaintiff. On February 27, 2002, the ALJ indicated that he had received the psychological evaluation report of Paul W. Rexroat, Ph.D., and invited plaintiff to comment on it. On April 23, 2002, after considering the record, Judge Griffith considered the Vocational Expert testimony and applied Grid Rules 202.20 and 202.21, Regulations Part 404, Subpart P, Appendix 2. He found that plaintiff had an exertional capacity for the full range of light work and concluded that he was not disabled. (Tr. 343-44.)

On June 21, 2002, this judicial action was timely commenced. After several motions for extensions of time in which to respond to the complaint, defendant moved to remand the action because the transcript of the administrative hearing could not be located. The court granted this motion on November 20, 2002. (Doc. 18.)

On January 24, 2003, the court was advised by defendant that the plaintiff's claim file and the recording of the administrative hearing had been found. Nevertheless, the court was advised that the Appeals Council remanded the action to another ALJ to evaluate plaintiff's work activity after his alleged onset date. (Doc. 19.)[1]

The Appeals Council remand order to another ALJ adverted to the plaintiff's earnings record which indicated he earned $8,623.75 in 2001, had no earned income in 2002, and was inconclusive as to whether plaintiff was working in 2003. Further, the Appeals Council indicated that the hypothetical questions to the VE in the original hearing were inexact about the number of hours the plaintiff could work, that the VE's hypothetical questions were inconsistent with the actual residual functional capacity findings, and that the questions did not include the plaintiff's use of a prescribed cane. After giving those directives, the Appeals Council vacated the final decision of ALJ Griffith and

---

[1]Document numerals refer to the enumerated documents filed in this judicial action.

-2-

remanded the case to an ALJ "for further proceedings consistent with this order and the order of the court." (Tr. 322.)[2]

On remand, ALJ James E. Seiler concluded it was unnecessary for him to review the "decisional deficiencies" identified by the Appeals Council in the earlier ALJ decision, because the Appeals Council had vacated the earlier decision. (Tr. 6.)

**C.  Administrative record evidence**

Plaintiff has worked at a number of jobs.  From 1985 to 1989 he worked as a bartender, from 1990 to 1991 as a temporary laborer, during 1991 as a plumber, from 1993 to 1995 as a maintenance man at a large grocery store, and during 1997 he worked part-time as a carpet layer. (Tr. 174.)  He also reported working in a warehouse, as a metal refinisher, a painter, a floor refinisher, construction laborer, and a maintenance worker.  (Tr. 136, 205-209.)  He worked at the Foodland Warehouse from April 2001 until February 2002, when he was fired due to poor performance and absenteeism.  (Tr. 235.) Plaintiff's SSA earnings record shows widely varying amounts of earned income from as early as 1976.  Most recently, in 1994 he earned $14,825.77, in 1995 $7,066.39, in 1996 $348.50, in 1997 $292.60, in 1998 $00, in 1999 $00, in 2000 $00, in 2001 $8,623.75, and in 2002 $1,848.25.  (Tr. 370.)

The pre-application record includes relevant information.  On February 9, 1999, when plaintiff was unemployed, he visited Snehal Gandhi, M.D., for left hip pain which at that time had been lasting for more than one year.  Dr. Gandhi noted that plaintiff needed to be evaluated for infarction, bone loss, and degenerative joint disease. (Tr. 276-77.)

On February 23, 1999, while still unemployed, plaintiff was seen by Dr. Gandhi, who had reviewed an x-ray of plaintiff's left hip.  Dr. Gandhi diagnosed avascular necrosis.[3]  Dr. Gandhi thought plaintiff was

---

[2]Transcript numerals refer to the administrative record transcript enumeration.

[3]Avascular necrosis occurs when the hip is deprived of its normal blood supply, and destruction of the bone tissue results. Webmd.com/hw/health_guide_atoz/nord756.asp. (Last visited March 9, 2006.)

-3-

allergic to opioid medication, but prescribed Oxycontin[4] because plaintiff was unable to afford any other pain medications. Dr. Gandhi noted that plaintiff would probably undergo hip replacement surgery. (Tr. 176, 275.)

On April 1, 1999, Eric Washington, M.D. examined plaintiff's left hip. Plaintiff had decreased rotation in the left hip but no significant swelling. Dr. Washington diagnosed left hip avascular necrosis. (Tr. 307.)

On June 17, 1999, plaintiff returned to Dr. Washington for his left hip pain. Dr. Washington noted plaintiff had significant avascular necrosis, and would require hip replacement surgery. (Tr. 303.)

On October 15, 1999, plaintiff visited Dr. Gandhi, who diagnosed plaintiff with avascular necrosis of the right hip. Plaintiff had a cane and walked with a limp. Dr. Gandhi believed plaintiff needed the hip replacement operation, but that his financial situation was slowing down treatment. Dr. Gandhi prescribed Meclizine,[5] Percocet,[6] and Vicodin.[7] (Tr. 271-72.)

On November 1, 1999, counselor M. Johnson conducted a face-to-face interview with plaintiff and noted that plaintiff had difficulty walking. (Tr. 221-24.)

On November 4, 1999, plaintiff underwent hip replacement surgery, performed by Dr. Washington. There were no complications. When discharged on November 10, 1999, plaintiff was told to walk and take the

---

[4]Oxycontin is a strong narcotic pain medication used to treat moderate to severe pain. Webmd.com/drugs. (Last visited March 9, 2006.)

[5]Meclizine is an antihistamine used to treat or prevent nausea, vomiting, and dizziness caused by motion sickness. Webmd.com/drugs. (Last visited March 9, 2006.)

[6]Percocet is a combination narcotic and non-narcotic drug used to treat moderate to severe pain. Webmd.com/drugs. (Last visited March 9, 2006.)

[7]Vicodin is a combination hydrocodone and non-narcotic drug used to treat moderate to severe pain. Webmd.com/drugs. (Last visited March 9, 2006.)

stairs as tolerated with a walker, to bathe as tolerated, and not to drive. Dr. Washington prescribed Vicodin and Flexeril.[8] (Tr. 309-321.)

On December 4, 1999, Ashley Miller performed a physical residual functional capacity assessment of plaintiff. She found that plaintiff could lift 20 pounds occasionally and 10 pounds frequently. She opined plaintiff could stand or walk for six hours and sit for six hours in an eight-hour workday. She found he was unlimited in his ability to push or pull. She found that plaintiff could frequently climb stairs or ramps, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. She found he had no manipulative, visual, communicative, or environmental limitations. (Tr. 186-193.)

On January 22, 2000, plaintiff called Darryl T. Zinck, M.D. Plaintiff complained of pain in his hip when walking, and told Dr. Zinck that he had undergone no physical therapy because he could not afford it. Dr. Zinck prescribed Tylenol #3. (Tr. 270.)

In a face-to-face interview conducted by counselor G. Nobe on July 25, 2000, it was noted plaintiff had difficulty walking. (Tr. 182-85.)

In a questionnaire completed by plaintiff on August 11, 2000, he alleged that he has pain in his hip and leg, and that this pain affects his ability to walk, stand, and sit, and is present on and off every day. He reported laying down when he was in pain, and taking Ibuprofen when needed. He reported sleeping with a pillow between his legs. (Tr. 167-68, 171.) Plaintiff reported that his condition makes it difficult to put on his pants, socks, and shoes. He is able to prepare canned food and sandwiches. His family takes him to the store, and he must lean on the cart or use his cane while shopping. He reported being able to do some cleaning and laundry. He is no longer able to hunt or fish, but is still able to watch television and read magazines. (Tr. 168-69.) Plaintiff reported leaving his home to go to the doctor and the social security office, and that, while he is out, he is in severe pain. He reported being crabby while out. He has no difficulty using the phone. (Tr. 169-70.)

---

[8]Flexeril is a muscle relaxant used to treat muscle pain and spasms. Webmd.com/drugs. (Last visited March 9, 2006.)

On September 20, 2000, plaintiff was examined by and had an x-ray performed on his right ankle and left hip by Jack C. Tippet, M.D. Dr. Tippet noted that plaintiff had no fracture in his ankle. Plaintiff's left hip x-ray showed that the prosthesis was in satisfactory position. Dr. Tippet's exam revealed that plaintiff could briefly stand on his heels and toes, got dressed, moved on and off the table without assistance, and was cooperative. Plaintiff's range of motion in his left hip was limited. (Tr. 279-84.)

Maria Schons completed a physical residual functional capacity assessment of plaintiff on December 14, 2000. She opined that plaintiff was able to lift 20 pounds occasionally and 10 pounds frequently. She found plaintiff could stand or walk for at least two hours in an eight-hour workday, and sit for six hours. She found plaintiff had unlimited ability to push or pull. She opined he could only occasionally climb, balance, stoop, kneel, crouch, and crawl due to residual pain from his hip replacement. She found that plaintiff was unlimited in his manipulative, visual, communicative or environmental abilities, except that he was to avoid concentrated exposure to vibrations. She noted she found his complaints partially credible, and that plaintiff was able to get on and off the table by himself and was able to dress himself. (Tr. 145-52.)

On February 1, 2001, plaintiff visited Dr. Gandhi for the first time since the surgery. Plaintiff had returned to normal activities, but called for a refill of Vicodin. Dr. Gandhi noted that plaintiff needed to show a continuity of care to stay on Medicaid. Plaintiff had fallen. Dr. Gandhi recommended an x-ray of plaintiff's hip, and noted that a recurrence of symptoms could be troublesome. (Tr. 266.)

On March 30, 2001, Dr. Gandhi wrote in a letter that, up until plaintiff's surgery, he had helped plaintiff manage his pain, which would be "severe and debilitating." He noted it would be difficult for him to gauge plaintiff's pain post-operatively. This requires much physical therapy, but he was not sure plaintiff had participated in it. (Tr. 244-45.)

Plaintiff worked for the Foodland Warehouse from April 2001 until February 2002.

On November 10, 2001, plaintiff visited the emergency room at St. Alexius Hospital in St. Louis, Missouri, complaining of left hip and groin pain due to a fall. Plaintiff was prescribed Motrin and told to apply moist heat or take a warm bath for the pain. An x-ray revealed that his hip prosthesis was well seated with no evidence of fracture, dislocation, or bony destruction. He was released to return to work on November 12. (Tr. 247-57, 381-92.)

On November 20, 2001, while still employed at the Foodland Warehouse plaintiff visited Dr. Pante for left hip pain. Plaintiff indicated that Vicodin helped his pain. (Tr. 264.)

On December 18, 2001, Dr. Washington completed a medical source statement for plaintiff. Dr. Washington diagnosed hip pain due to the hip prosthesis surgery in November 1999. He opined plaintiff was not limited in his ability to sit but could only stand for two hours and walk for 30 minutes. He found plaintiff could lift 20 to 25 pounds occasionally, could carry 20 pounds occasionally, and could never carry 25 pounds. Plaintiff's ability to balance was limited. Dr. Washington found that plaintiff's left hip pain reduced his range of motion. He opined plaintiff could use a cane as needed, and he would be required to lay down and take a nap during an eight-hour workday. He opined these conditions would last for 12 consecutive months, and that plaintiff should not work full-time. Dr. Washington stated that plaintiff's most severe limitations began March 7, 2000. (Tr. 259-62.)

On January 28, 2002, plaintiff underwent the consultive psychological evaluation by Paul W. Rexroat, Ph.D., which was ordered by ALJ Griffith. During the evaluation, plaintiff complained of money and health problems. Dr. Rexroat opined plaintiff was functioning at an average level of intelligence, and plaintiff described significant symptoms of depression. Plaintiff had only mild limitations in his daily living. He was gruff and irritable but otherwise showed acceptable social skills. He showed no limitations in concentration, persistence, pace, or memory. Dr. Rexroat found that plaintiff suffered from recurrent mild Major Depression. (Tr. 238-41.)

In a medical source statement completed January 28, 2002, Dr. Rexroat found that plaintiff had no limitations in understanding, remembering, and carrying out instructions, and was moderately limited

-7-

in his abilities to interact with the public, supervisors, and co-workers, in his ability to respond appropriately to work pressures, and to respond appropriately to changes in routine. He stated that plaintiff suffers from mild depression and finds it difficult to be around other people. (Tr. 242-43.)

In February 2002, plaintiff was fired from his warehouse job due to poor performance and absenteeism. (Tr. 235.)

On October 31, 2002, plaintiff visited St. Louis ConnectCare complaining of pain since his hip replacement surgery. It was noted his left hip flexion was painful and limited. Plaintiff complained of spontaneous crying spells, hopelessness, and insomnia. (Tr. 379-80, 392.)

**C. Testimony of plaintiff**

At the hearing held August 3, 2004 before ALJ Seiler,[9] plaintiff testified that at that time he was 45 years old and lived with his mother. He testified he had no current source of income and was not on Medicaid. (Tr. 56.) His prior employment included working at Foodland in 2001. He was supposed to do maintenance but testified he did nearly nothing while there, and that he only worked two hours during his six-hour shift. (Tr. 57-58.)

Plaintiff testified that his hip replacement surgery in 1999 did not fix his problem. He reported having no strength in his left leg, and he often falls down. He testified that the cane helps. He has pain in his back and neck on and off, and laying down helps the pain. (Tr. 59-60.)

Plaintiff testified he takes Tylenol for his pain, but that it does not help. His falls have caused him to hurt his nose and he has gotten half a dozen black eyes, and chipped a tooth. He often gets headaches. (Tr. 61-62.)

Plaintiff also testified that he is depressed. He is worried about what will happen to him when his mother dies, and that he cries a couple

---

[9]Plaintiff also testified during the hearing held on January 3, 2002, by Administrative Law Judge Griffith. (Tr. 25-51.)

times a week when he thinks about his situation. He testified he has problems concentrating, and that he often leaves his groceries when he goes to the grocery store because he cannot deal with people. His mother often does the shopping, but he sometimes goes with her. (Tr. 62-65.)

Plaintiff testified that he does not drive, and his sister takes them shopping. His sister drove him to the hearing. He leaves the house about twice a week. He belongs to no social clubs and does not attend church.[10] He testified he has not seen a friend in two years, and that he used to hunt and fish with them but is unable to do so now. He testified he sleeps about two hours a day because of his pain, but that he takes a couple of one-hour naps per day. (Tr. 65-68.)

Plaintiff testified he takes one bath a day, and that he has pain when he dresses himself. He tries to wash the dishes, and does not vacuum because he fell while doing so. He watches television during the day, often sports. He testified his sister or mother mows the lawn. (Tr. 67-68, 75.)

Plaintiff testified that he was unable to walk into the hearing without stopping and resting to relieve his left leg of weight. He testified he could lift a gallon of milk while sitting, but not a case of soda due to a lack of strength. He would not be able to carry an empty box with both hands because he would not be able to use his cane. He testified he had no problem reaching. He can walk up a couple steps, but crawls up the flight to his house. (Tr. 70-71.)

Plaintiff testified he lays on his right side when watching television. He can watch an entire television program. He cannot read, because he testified he is illiterate. He testified he had not seen a doctor in about one year, and no longer had Medicaid coverage. (Tr. 71-73.)

Plaintiff testified he never participated in physical therapy because he had no insurance to pay for it. He testified his doctors told him to lift his leg at home. He smokes cigarettes when he can get

---

[10] At this point in the testimony, plaintiff stood, and testified that it hurt him to sit down. (Tr. 65.)

them from his mother, and does not drink alcohol because he cannot afford it. (Tr. 75-76.)

**D. Testimony of Vocational Expert**

At the hearing held August 3, 2004, Vocational Expert Michael Brethauer[11] was asked to consider a hypothetical individual with plaintiff's age, education, and job experience, with the following limitations:

> only able to stand for up to two hours in an eight-hour workday, is able to walk up to 30 minutes at a time, and the individual's limited to lifting up to 20 pounds. And the individual's been diagnosed with mild depression with a GAF of 75, and the individual has a lower left extremity strength of four on a scale of four out of five. Are there any jobs that such an individual could perform as generally performed within the national economy?

---

[11]At the hearing held on January 3, 2002, VE James Israel testified that plaintiff had held jobs as a janitor, carpet layer, bartender, and various labor jobs, all of which were heavier work, and the janitor job was medium heavy, because tasks varied. Some of plaintiff's past work was semi-skilled, and the janitorial and maintenance work was unskilled. He testified plaintiff had no transferrable skills. (Tr. 47.) The VE was asked this hypothetical:

> assume a hypothetical individual, 42 years of age, having an eighth grade education, being literate and able to communicate in English, with the ability to lift and carry 20 pounds occasionally, 10 pounds frequently, sit for six hours in an eight hour day with normal breaks, stand and, or walk for one hour in an eight hour day with breaks, certainly with limitations of not climbing any ropes or ladders, not climbing the stairs, only occasional use of ramps, only occasional balancing and stooping, not kneeling or crouching, only occasionally crawling. Would that person be able to perform any of the past relevant work which you have listed today?

In response, the VE testified that such a person would not be able to perform plaintiff's past relevant work, but that there would be other occupations such a person could perform. (Tr. 48.)

When asked whether a person who could not stand or sit for longer than 15 minutes without being required to lay down because of pain would be able to work, the VE testified that such a person would not be able to sustain employment. The VE testified that constant irritability is a negative factor that would exacerbate any work situation. (Tr. 49.)

-10-

The VE testified that such an individual would be able to work and would be able to perform jobs such as gate guard, of which there are 3,000 jobs in Missouri, and 120,000 jobs in the nation. The VE stated that such a person could perform light duty assembly jobs, of which there were 5,500 in Missouri and 220,000 in the national economy. He opined such a person could drive a taxi or perform light hand packing. (Tr. 77-78.)

When asked to consider that the same hypothetical individual had to use a cane to walk, the VE testified that all of those jobs, except gate guard, would be available to that person. (Tr. 79.)

When asked to consider that the hypothetical person was limited to two hours of standing, no more than 30 minutes of walking, and the ability to lift 25 pounds occasionally and 10 pounds frequently, was limited in his ability to balance, must use a cane, and may need to take a break when standing for long periods, and would need to lie down and take a nap during an eight hour workday, the VE responded that, if the nap was unscheduled, it would be disruptive in a normal workday. If it were scheduled and taken as part of a normal lunch break, such a person would still be able to perform all of the jobs above, except gate guard. (Tr. 79-80.)

When asked to assume such an individual was limited to sitting for no more than 20 minutes, standing for no more than 10 minutes, could lift only 10 pounds, and could not climb a flight of steps, the VE testified that such a person could not perform plaintiff's past work, but could still perform some bench assembly jobs. If such a person were required to lay down at unpredictable times once or twice a day for 45 minutes, the VE testified that there was no work such a person could do. (Tr. 81-82.)

**E. Decision of ALJ**

In a December 18, 2004 decision denying benefits, the ALJ determined that the issues were whether plaintiff was disabled, and if so, when this disability commenced and its duration. (Tr. 6.)

The ALJ found that plaintiff had engaged in substantial gainful activity since the alleged disability onset date, June 9, 2000. This employment was the work at Foodland, a grocery store, from April 2001 until at least January 28, 2002. The ALJ noted that plaintiff earned $8,623.75 in 2001, and $1,848.25 in 2002, averaging approximately $1,077.97 per month from April to December 2001. Such earnings showed that plaintiff engaged in substantial gainful activity during this period. (Tr. 7.)

The ALJ noted that plaintiff alleged he did not really work more than two hours of his five hour shift, that the work ended because he had difficulty walking, and he had to use a cane. However, the ALJ noted that there was no evidence that Foodland felt it was paying plaintiff more than he was worth. The ALJ found that eight months of work was more than an unsuccessful work attempt. The ALJ found that there were less than 12 months between June 2000 until plaintiff started working in April 2001, so he was not disabled for that time. Therefore, the ALJ continued to determine if plaintiff was disabled from January 2002, when he quit working, until present. (Tr. 7-8.)

The ALJ found that plaintiff had a recent diagnosis of depression and a history of left hip artroplasty, but that these impairments were not included in the listings set forth in Appendix 1, Subpart P, Regulations No. 4. The ALJ found that the medical records did not show ongoing diagnosis of medically determinable etiologies for back, head and neck pain, and that plaintiff did not seek treatment more than rarely. The ALJ discredited the opinion of Dr. Washington, because it was internally inconsistent, and found that plaintiff's complaints were not fully credible. (Tr. 9-20.)

The ALJ noted that plaintiff's allegations that he was illiterate were not credible due to plaintiff's own written responses to questions on the pain questionnaire, and that he reported reading magazines. There was no persuasive evidence of any reading or learning disorder. (Tr. 9.)

The ALJ determined that plaintiff had the RFC to frequently lift and carry more than ten pounds, occasionally lift and carry 20 pounds, stand or walk for more than two hours in an eight hour day, and walk for more than 30 minutes at a time. Plaintiff could sit for eight hours a

day. Since plaintiff had worked since his alleged onset date, the ALJ found that he could perform past relevant work like that performed at Foodland, and was not disabled. (Tr. 21-22.)

The ALJ noted that, even if plaintiff could not perform his past relevant work, the ALJ found that there were other jobs in the economy that plaintiff could do given his RFC, according to the VE's testimony and the opinion of the ALJ. (Tr. 22.)

## II. Discussion

### A. General legal standard

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir. 2003). So long as substantial evidence supports the final decision, the court may not reverse it merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-41, (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a determination or decision is made and the next step is not reached; if

no such decision can be made, the analysis continues to the next step. 20 C.F.R. § 404.1520(a)(4).

## B. Failure to evaluate the entire record

As set forth above, the ALJ determined that plaintiff engaged in substantial gainful activity after the alleged onset of his disability on June 9, 2000, applying Step One of the prescribed analysis. Plaintiff's sole substantive argument before this court is that ALJ Seiler failed to consider the entire record before him when determining plaintiff's RFC. Specifically, the plaintiff argues that the ALJ erred by not considering whether plaintiff was disabled prior to June 2000. Plaintiff argues that the ALJ should have extended his analysis to the date alleged in the earliest application (Tr. 134), October 20, 1997. (Doc. 37.)

The court concludes that the ALJ should have considered whether plaintiff was disabled at any time demonstrated by the evidence, not just on and after the disability onset date alleged by plaintiff in his most recent application for benefits. In his decision the ALJ mentions medical records that occurred before June 2000; however, he never analyzed the pre-June 2000 medical evidence to determine plaintiff's RFC before the hip replacement surgery.

Because plaintiff had performed substantial gainful activity from April through December 2001, and because the most recently alleged disability onset date (June 9, 2000) was less than 12 months before April 2001, the ALJ determined under 20 C.F.R. § 416.920(a)(4) that plaintiff was not disabled from June 2000 through December 2001. In the alternative, the ALJ determined that the record does not otherwise support a finding of disability after June 2000. (Tr. 8.)

The failure to consider the pre-June 2000 evidence was error. Plaintiff had applied for SSI benefits on November 1, 1999. Although this application was denied on January 6, 2000, plaintiff requested of each ALJ that the earlier application be reopened, with its alleged onset date of October 20, 1997. (Tr. 83, 93.) Because the current application was filed less than 12 months later, the earlier application

-14-

was subject to being reopened without a showing of good cause. See 20 C.F.R. §§ 416.1487, 1488. This was not done.

The disability onset date determined by plaintiff "is evidence that the claimant believed that the disability began on that date, it is not conclusive. [The ALJ] must determine from all of the evidence the date, if any, upon which the claimant became disabled within the meaning of the law." McGinty v. Heckler, 713 F.2d 398, 400 (8th Cir. 1983).

In Vandenboom v. Barnhart, the court held that the ALJ improperly considered only evidence after plaintiff's alleged disability onset date, even though he had been involved in a car accident two years before that date and that accident was the basis for his alleged disability. 421 F.3d 745, 750 (8th Cir. 2005).

> The ALJ was entitled to consider all of the evidence in the record. All of the medical evidence indicates that Vandenboom's headaches and related problems resulted from the September 1999 accident with no intervening trauma and no indication that his symptoms were deteriorating or were progressive in nature. Thus, *there is no valid reason to exclude consideration of medical records dated prior to Vandenboom's alleged date of onset*.

Id. (emphasis added); see Nettles v. Sullivan, 956 F.2d 820, 821 (8th Cir. 1992) (ALJ erroneously considered himself bound by date cited by plaintiff, and failed to consider all relevant factors to determine the correct onset date).

For these reasons, the Commissioner's final decision is reversed under Sentence 4 of 42 U.S.C. § 405(g) and remanded for reconsideration. On remand, the ALJ shall consider the entire record, including any pre-June 2000 medical records and plaintiff's work history during that period to determine whether plaintiff was disabled at any time before June 2000.

An appropriate judgment order is issued herewith.

_____
**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 27, 2006.